### In re the Matter of Dennis Darol LINEHAN.

No. C1–95–2022.

Supreme Court of Minnesota.

Dec. 12, 1996.

---

Lisbeth J. Nudell, Minneapolis, Michael F. Cromett, St. Paul, Eric S. Janus, Minneapolis, for appellant.

Daniel Homstad (Kathleen Milner, of counsel, Minnesota Civil Liberties Union), Minneapolis, for amicus curiae.

Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant Ramsey County Attorney, St. Paul, for respondent Ramsey County.

Hubert H. Humphrey, III, Attorney General, John L. Kirwin, Assistant Attorney General, St. Paul, for respondent State.

## OPINION

KEITH, Chief Justice.

Appellant Dennis Darol Linehan was civilly committed under the Sexually Dangerous Persons Act on July 27, 1995 at the age of 54 after spending most of his life in the criminal justice system for sex-related crimes. *See* Act of August 31, 1994, ch. 1, art. 1, 1995 Minn. Laws 5, 5–9 (1994 first special session), *codified in relevant part at* Minn.Stat. §§ 253B.02, subd. 18b, 253B.185 (1994) (SDP Act). The district court concluded that the application of the Act to Linehan was constitutional and found that: (1) Linehan had engaged in a course of harmful sexual conduct; (2) Linehan suffers from an antisocial personality disorder (APD); and, as a result, (3) it is "highly probable" that Linehan will engage in harmful sexual conduct in the future. The court of appeals affirmed Linehan's initial commitment. *In re Linehan*, 544 N.W.2d 308, 319 (Minn.App.1996) (*Linehan II* ).

Linehan contends that the commitment violates his constitutional rights to substantive due process and equal protection under the Minnesota and United States Constitutions, and his rights against ex post facto laws and double jeopardy under the United States

Constitution. Linehan also argues that if the commitment is constitutional, then the district court clearly erred in finding that it is highly probable that he will engage in harmful sexual conduct in the future and that this probability is a result of his past conduct and his APD. Linehan does not dispute that he has APD or that he once engaged in a course of harmful sexual conduct. Rather, he challenges the district court's method of prediction and the specificity of the court's findings.

We conclude that Linehan's initial commitment did not violate his constitutional rights, nor did the district court clearly err in evaluating the evidence; therefore, we affirm.

## I.

### Facts and Procedural History

Linehan was sexually and physically abused as a child and he began a record of sexual misconduct in his teens. In 1956, at age 15, Linehan pulled down the shorts of a 4–year–old girl and was sent to reform school. In 1960, at age 19, he had intercourse with a 13–year–old girl. In 1963, Linehan engaged in window peeping. Later that year, he and a friend raped L.H. On June 10, 1965, after window peeping, Linehan killed B.I. while attempting to sexually assault her. Before being arrested for B.I.'s death, Linehan committed two additional sexual assaults—including rape—in July of 1965. Linehan pleaded guilty to kidnapping B.I. and the murder charges against him were dropped. He was sentenced to a maximum term of 40 years and began serving time at the Minnesota Correctional Facility in Stillwater. Linehan's sentence expires on August 21, 1997.

Linehan escaped from Stillwater's minimum security facility on June 20, 1975, and 11 days later he assaulted 12–year–old T.L. in a ditch off the side of a Michigan road. He was convicted of assault with intent to commit criminal sexual conduct and imprisoned in Michigan. Linehan was returned to Stillwater prison 5 years later. He remained at Stillwater for most of the next 12 years.

On December 30, 1992, Linehan was committed to the Minnesota Security Hospital (MSH) under the Psychopathic Personality Commitment Act (PP Act). *See* Minn.Stat. §§ 526.09–.10 (1992) (current version at Minn.Stat. § 253B.02, subd. 18a (1994)). However, Linehan's PP Act commitment was vacated by this court on June 30, 1994. *In re Linehan*, 518 N.W.2d 609, 614 (Minn.1994) (*Linehan I* ). We held that Ramsey County failed to prove by clear and convincing evidence that Linehan was utterly unable to control his sexual impulses. *Id.* The "utter inability" element of proof under the PP Act was established when the statute was narrowed in *State ex rel. Pearson v. Probate Court of Ramsey County*, 205 Minn. 545, 555, 287 N.W. 297, 302 (1939) (upholding the statute against, inter alia, a vagueness challenge), *aff'd*, 309 U.S. 270, 277, 60 S.Ct. 523, 527, 84 L.Ed. 744 (1940).

On August 18, 1994, after the reversal of his PP Act commitment and his discharge from MSH, Linehan was paroled to Residence 4 on the grounds of the Stillwater correctional facility. Residence 4 was converted to a halfway house for Linehan because no other facility would accept him. At the halfway house, Linehan was under "intensive supervised release." Residence 4 was equipped with phone taps (of which Linehan was notified) and hidden video surveillance cameras. Linehan was also subject to drug testing. Linehan continued his treatment as a sex offender at Residence 4. He began participating in the Atlantis outpatient sex offender program after completing the inpatient Transitional Sex Offender Program (TSOP). Atlantis conducted group therapy sessions at Residence 4 for Linehan and other sex offenders.

On August 31, the Minnesota Legislature met in special session and amended the civil commitment statute to include "sexually dangerous persons." Act of August 31, 1994, ch. 1, art. 1, 1995 Minn. Laws at 5–9. A "sexually dangerous person" has engaged in a course of harmful sexual conduct; suffers from a sexual, personality, or other mental disorder or dysfunction; and, as a result, is likely to engage in serious and harmful sexual conduct in the future. Minn.Stat. § 253B.02, subds. 7a, 18b(a) (1994). Commitment under the SDP Act does not require proof that the proposed patient is unable to

control his or her sexual impulses. *Id.* § 253B.02, subd. 18b(b). On September 2, respondent Ramsey County petitioned for Linehan's commitment under the SDP Act.

The district court denied Linehan's motion to dismiss the petition based on as-applied constitutional challenges, and the court of appeals later affirmed. *Linehan II*, 544 N.W.2d at 317–19. Both courts concluded that APD is a mental disorder that the state may use to trigger civil commitment of dangerous persons; that the legislature had adequate reasons for applying civil commitment to sexually dangerous persons with APD but not to those without a mental disorder or dysfunction; and that the purpose and effect of the SDP Act is treatment, not punishment. The court of appeals correctly placed the burden of persuasion on the state regarding the substantive due process and equal protection challenges. *See In re Blodgett*, 510 N.W.2d 910, 914, 916–17 (Minn.1994); *Skeen v. State*, 505 N.W.2d 299, 312 (Minn.1993).

In its opinion, the district court interpreted the SDP Act to require proof that it is "highly probable" that the proposed patient will sexually harm others in the future, even though the statute refers to "likely" future harm. Minn.Stat. § 253B.02, subd. 18b(a)(3). The court relied on the clear and convincing evidence standard for such commitments, due process concerns, and the seriousness of the proceedings. The court of appeals agreed with the district court's interpretation, and described the standard for prediction as "highly likely." *Linehan II*, 544 N.W.2d. at 313–14.

Much of the initial commitment hearing was devoted to expert testimony.[1] After hearing from Stillwater personnel and three of Linehan's victims, the county's case focused on two expert witnesses. Dr. Michael Millard testified that Linehan suffers from alcohol dependence (in remission), impulse control disorder, and APD. He also concluded that Linehan is very likely to reoffend, based on Department of Justice (DOJ) base rate statistics and five multi-factor violence prediction checklists derived from various studies.

Dr. Douglas Fox also testified in favor of commitment. Although he did not examine Linehan, Dr. Fox concluded from written records that Linehan meets the criteria for APD, paraphilia (not otherwise specified), alcohol dependence (by history), and voyeurism (by history) according to the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) (*DSM–IV*). Dr. Fox acknowledged, however, that Linehan is not "mentally ill," as he understood the term. Dr. Fox relied primarily on DOJ base rates for rearrests and the factors in *Linehan I*, 518 N.W.2d at 614, to conclude that Linehan is dangerous.

Linehan's experts disagreed with these conclusions. Dr. John Austin interviewed Linehan for the hearing and concluded that APD is not an appropriate diagnosis, although in 1992 he had concluded otherwise. Based partly on Linehan's age and the results of a "psychopathy checklist" also used by Dr. Millard, Dr. Austin concluded that the likelihood of reoffense is low.

Dr. Darel Hulsing, Linehan's treating psychiatrist during his PP Act commitment, concluded in 1992 that Linehan was not mentally ill, mentally disordered, or incompetent, and did not suffer from impulse control disorder. Hulsing diagnosed Linehan with APD in 1992, but at the SDP commitment hearing Hulsing testified that he had intended a "softer" conclusion than the label implied. Dr. Hulsing acknowledged that an APD diagnosis may partly rest on thought-based criteria, such as a lack of empathy, and is not restricted to evidence of outward physical behavior.

Linehan also called Professor Herb Kutchins, a *DSM* expert and critic, to discredit *DSM*'s method of defining supposed mental disorders in terms of characteristics that are largely behavioral. *DSM* offers diagnostic checklists, but it does not explain the under-

---

1. A significant portion of the hearing was also occupied by consideration of a videotape of Linehan twice masturbating in the upstairs bathroom of Residence 4 soon after physical play with his stepdaughter. The conduct took place during a time-limited visit on January 1, 1995. There was also testimony that the same behavior occurred the day before, but a videotape was not preserved.

lying cause of the purported disorders and dysfunctions. Dr. Kutchins also testified that predictions of individual behavior cannot be made from *DSM*-based diagnoses.

Linehan then attacked the accuracy of the prediction evidence used by the county's experts. Dr. R. Owen Nelson, a clinical psychologist, testified that multi-factor "clinical" predictions based on an examiner's experience and judgment are generally less accurate than "actuarial" predictions founded on well-tailored base rate statistics. Dr. Nelson used a base rate of 8% to illustrate that even an actuarial prediction of future dangerousness will often produce a "false positive." [2]

After 20 days of testimony, the district court issued an initial commitment order. Linehan was committed to MSH, or to a treatment facility designated by the Commissioner of Human Services, for a 60–day treatment evaluation. *See* Minn.Stat. §§ 253B.18, subds. 1, 2, 253B.185, subd. 1. The court found clear and convincing evidence that Linehan (1) engaged in a course of harmful sexual conduct, and (2) manifests an Axis II diagnosis of antisocial personality disorder.[3] As a result of both (1) and (2), the court concluded that it is highly probable that Linehan would engage in harmful sexual conduct in the future.

*DSM–IV* describes the "essential feature" of antisocial personality disorder as "a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." *DSM–IV* at 645. This pattern must be indicated by satisfaction of at least three of seven diagnostic criteria.[4] *Id.* at 649–50. The district court agreed with the county's experts and concluded that Linehan has APD based on five of the seven criteria:

(1) Failure to conform to social norms of lawful behavior, demonstrated by his past course of harmful sexual conduct;

(2) Deceitfulness, shown by Linehan's various versions of B.I.'s death; his testimony regarding the seriousness of his attack on T.L., which conflicted with the victim's testimony; Linehan's statement to Dr. Millard that he no longer masturbated when the evidence showed otherwise; and Linehan's violation of North Dakota prison rules by selling merchandise to other inmates and charging interest ("conning others for personal profit," *Id.* at 650);

(3) Irritability and aggressiveness, expressed in his attacks on women when he was out of custody, and in shouting at and other irritability toward staff at MSH and Residence 4;

(4) Consistent reckless disregard for the safety of self or others, also demonstrated by his past course of harmful sexual conduct; and

(5) Lack of remorse, based on Linehan's unconvincing display of regret at the hearing; Linehan's August 1994 telephone conversation with his wife during which Linehan said that T.L. "deserved what she got" for putting herself in such a position; and

---

2. Testimony regarding statistical predictions focused on base rates from the United States Department of Justice. Those statistics indicated that among prisoners released in 1983 whose most serious offense at the time of release was rape, 7.7% were rearrested for rape within 3 years of their release. *Bureau of Justice Statistics, U.S. Dep't of Justice, Recidivism of Prisoners Released in 1983*, at 6 (1989) [hereinafter *DOJ Recidivism Report*] (table 9).

 Dr. Nelson testified that if the historical evidence of recidivism is low among a particular population (the "base rate"), and if one assumes that not all predictions are accurate ("accuracy" less than 100%), then the number of *inaccurate* predictions of future violent conduct for those who fit the characteristics of the population ("false positives") will be high when compared to *all* predictions of future violent conduct ("false positives" plus "true positives"). Dr. Nelson explained that if one predicts from a base rate of 8%, and if prediction accuracy is 75%—a number he considered the mean for expert attempts at predicting violence—then 79% of all predictions of future violence will be wrong.

3. "Axis I" disorders generally include mental illnesses and sexual disorders, while "Axis II" lists personality disorders. Both personality disorders and sexual disorders are subsets of "mental disorders." *See DSM–IV* at xxi–xxii.

4. APD also requires a "conduct disorder" before age 15. *DSM–IV* at 646. Otherwise, *DSM–IV* does not set time parameters for the behavior used in diagnosing APD. Present exhibition of behavior satisfying the APD criteria is apparently not necessary for the diagnosis to persist: Dr. Hulsing testified that if a person has APD, that person's thinking and personality condition endures, even if the person's behavior changes.

Linehan's failure to recognize that he has caused more than 12 hours of misery to others, as he claimed during an interview with Dr. Millard.

The court did not rest its conclusion on the remaining criteria: impulsivity or failure to plan, and consistent irresponsibility.

In finding that Linehan would very likely repeat a course of harmful sexual conduct, the district court used a multi-factor analysis. First, the court considered all six factors for predicting dangerousness outlined in *Linehan I*, 518 N.W.2d at 614 (listing demographics; history of violent behavior; base rate statistics; sources of stress; similarity of present and future contexts to the past; and record of sex therapy). Linehan turned 54 years old on April 15, 1995, which the court believed weighed in his favor. *See, e.g., DSM–IV* at 648; *DOJ Recidivism Report* at 5 (table 7). However, Linehan attacked T.L. while he was in his mid-thirties, and Dr. Fox testified that child molesters are less prone to moderate their behavior with age than are other criminals. Linehan's history of violent conduct weighed against him, and the court discounted the length of time since his last criminal act by his lack of opportunity to reoffend while in custody. Stress upon release seemed potentially problematic to the court, although the court noted evidence of Linehan's ability to cope and of a helpful support structure. Linehan completed an Atlantis chemical dependency program in 1988, but the court stated that a noncustodial environment would offer many opportunities to attack young women. Linehan also completed TSOP, but he does not participate in Alcoholics Anonymous and he refused to enter an offender treatment program at MSH during his PP Act commitment. Possible future alcohol use was troubling to the court in light of Linehan's pattern of alcohol-related crimes.

The district court also considered base rate statistics introduced at the hearing, but con-cluded that the statistical evidence was not dispositive. The court noted several reasons for believing the 7.7% rearrest rate for rapists in the DOJ survey was not a sound base rate in Linehan's case. First, rapes committed 4 or more years after release were not included in the survey. *See DOJ Recidivism Report*, at 1, 6 (table 9). Second, not all rapes are reported and not all rapists are arrested. *See, e.g., Bureau of Justice Statistics, U.S. Dep't of Justice, Criminal Victimization in the United States, 1992*, at 7 (1994) (table 5). Third, the 7.7% figure included only rearrest for rape, and therefore did not include rearrest for other crimes that are included in the definition of "harmful sexual conduct." Minn.Stat. § 253B.02, subd. 7a; *see DOJ Recidivism Report*, at 1, 6 (table 9). Finally, the court conceded that Linehan's age group was less likely to be rearrested, but emphasized that rearrest was more likely for those with longer records and for those first arrested at a younger age. *See DOJ Recidivism Report*, at 1, 7–10 (tables 11, 14, 15, 16, 18).

In addition, the district court weighed other factors it believed were sound indicators of future conduct. The court concluded that Linehan was still attracted to young girls,[5] and recently displayed impulsiveness,[6] deceitfulness, lack of remorse, and aggressiveness. Finally, the court considered Linehan's APD, a disorder that is characterized by an enduring pattern of behavior.

On balance, Linehan's past record, current behavior, and APD sufficiently outweighed the evidence against commitment as a sexually dangerous person. The court of appeals affirmed. *Linehan II*, 544 N.W.2d at 313–16. On February 22, 1996, after a 60–day treatment evaluation and a review hearing required by the Act, the district court issued a final commitment order. Pursuant to that order, Linehan was indeterminately committed to MSH and to the Psychopathic Personality Treatment Center in Moose Lake.

5. The court found that Linehan masturbated in privacy after physical play with his stepdaughter during visits at Residence 4 on December 31, 1994 and January 1, 1995.

6. The court also cited the masturbation incidents to conclude that Linehan appeared to suffer from "a degree of impulsivity and lack of control in connection with sexual impulses." On appeal to this court, Linehan inaccurately asserts that there was no evidence to support and the district court made no findings regarding "volitional impairment at this time."

Minn.Stat. §§ 253B.18, subds. 2, 3, 253B.185, subd. 1.

## II.

### The Sexually Dangerous Persons Act

The Sexually Dangerous Persons Act created a new class of individuals eligible for civil commitment for treatment.[7] The Act defines a sexually dangerous person as one who:

(1) has engaged in a course of harmful sexual conduct * * *;

(2) has manifested a sexual, personality, or other mental disorder or dysfunction; and

(3) as a result, is likely to engage in acts of harmful sexual conduct * * *.

*Id.* § 253B.02, subd. 18b(a).

The SDP Act is a departure from the Psychopathic Personality Act upheld in *Blodgett,* 510 N.W.2d at 918. First, commitment under the SDP Act does not require proof that the proposed patient has an inability to control his or her sexual impulses. Minn. Stat. § 253B.02, subd. 18b(b). Second, the SDP Act describes the conduct in which the patient must have engaged before the commitment, and in which the patient is likely to engage in the future. "Harmful sexual conduct" is sexual conduct that "creates a substantial likelihood of serious physical or emotional harm to another." *Id.* § 253B.02, subd. 7a(a). Such harm is rebuttably presumed for conduct described by certain criminal offenses. *Id.* § 253B.02, subd. 7a(b) (applying the presumption to criminal sexual conduct in the first through fourth degrees, and to crimes such as murder, manslaughter, and kidnapping, if such crimes were motivated by sexual impulses or were part of a pattern of behavior that included criminal sexual conduct as a goal).

Otherwise, the operation of the SDP Act is substantially the same as the PP Act. Both contain three substantive elements. *See Linehan I,* 518 N.W.2d at 613. Moreover, the civil commitment procedures are similar under the SDP Act and the PP Act. The hearing procedure is the same for both Acts, and generally follows the procedure for committing the mentally ill and dangerous. *See* Minn.Stat. § 253B.185, subd. 1. *But see id.* (requiring county attorneys to screen and file petitions for the commitment of sexually dangerous persons or persons with a sexual psychopathic personality[8]). Grounds for commitment must be demonstrated by clear and convincing evidence for all three categories of patients. *See id.* §§ 253B.18, subd. 1, 253B.185, subd. 1. If the patient is committed pursuant to any of the three categories, the treatment facility must submit a treatment report within 60 days of the commitment, and the committing court must then hold a review hearing. *See id.* §§ 253B.18, subd. 2, 253B.185, subd. 1. Finally, the same procedures for conditional and full discharge apply to all three categories of patients. *See id.* §§ 253B.18, subds. 7, 15, 253B.185, subd. 1.

## III.

### The Likelihood of Harmful Sexual Conduct

■ The SDP Act requires a finding that the proposed patient is "likely" to engage in harmful sexual conduct in the future. *Id.* § 253B.02, subd. 18b(a)(3). The evidence must be clear and convincing. *Id.* §§ 253B.18, subd. 1, 253B.185, subd. 1; *see also Addington v. Texas,* 441 U.S. 418, 425–33, 99 S.Ct. 1804, 1809–13, 60 L.Ed.2d 323 (1979) (holding that due process requires clear and convincing evidence for civil commitment of the mentally ill and dangerous).

7. The civil commitment statute also allows commitment for the treatment and care of persons who are chemically dependent and dangerous to themselves or others, Minn.Stat. § 253B.02, subd. 2; mentally retarded and dangerous to themselves or others, *id.* § 253B.02, subd. 14; mentally ill or mentally ill and dangerous to the public, *id.* § 253B.02, subds. 13, 17; and sexual psychopathic personalities, *id.* § 253B.02, subd. 18a. In addition, the Commissioner of Health is authorized to confine persons who constitute a health threat to others. Minn.Stat. §§ 144.12, subd. 1(7), 144.4171, subd. 1, 144.4172, subd. 8 (1994 & Supp.1995).

8. "Sexual psychopathic personality" is equivalent to "psychopathic personality" under the 1994 amendments to the Civil Commitment Act. *See* Minn.Stat. § 253B.02, subd. 18a; Act of August 31, 1994, ch. 1, art. 1, sec. 5(a), 1995 Minn. Laws at 8.

The state believes that the ordinary meaning of "likely" is more likely than not. Even if the petitioner must satisfy the clear and convincing evidence standard, the state contends that the underlying fact to be determined (a probability) is not necessarily related to the burden of proof (the degree of certainty).

We agree with the lower courts' conclusions for two reasons. First, the best reading of the statute and its concern for accurate factual findings precludes the state's construction. The SDP Act's demand for "likely" harm implies that committing courts cannot combine a factual element that requires only 50.1% probability with an evidentiary standard of less-than-certainty. *See* Minn.Stat. § 253B.02, subd. 18b(a)(3). We do not believe that the legislature intended to *weaken* the standard of likelihood in the SDP Act by combination with a relatively *high* burden of persuasion—the clear and convincing evidence standard. The district court applied this heightened burden of persuasion to each element of proof necessary under the Act, but by demanding *highly* likely future harm, the lower courts established a degree of overall certainty consistent with the statute.

Second, and in the alternative, due process concerns under the state and federal constitutions constrain legislative discretion to set standards of likelihood when liberty is at stake. U.S. Const. amend. XIV; Minn. Const. art. I, § 7. "The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state." *Addington*, 441 U.S. at 427, 99 S.Ct. at 1810. No less is required by the guarantee of due process in our state constitution. *See* Minn. Const. art. I, § 7; *Skeen*, 505 N.W.2d at 313; *State v. Fuller*, 374 N.W.2d 722, 726–27 (Minn.1985). *Cf. Schulte v. Transportation Unlimited, Inc.*, 354 N.W.2d 830, 833–35 (Minn.1984) (applying notice standards under the due process clauses of the Minnesota and United States Constitutions as a procedural safeguard for unemployment compensation recipients). If the state were to require only a 10% probability of dangerousness (the fact to

be demonstrated) and a clear and convincing evidence standard (say, a 75% degree of certainty), then the demand of due process that the citizen not share equally the risk of error would be undermined. *Addington*'s holding was partly motivated by substantive concerns about the preservation of individual liberty. *See Addington*, 441 U.S. at 427, 433, 99 S.Ct. at 1810, 1813. Hence, the error that due process seeks to avoid is a *false* prediction of future harmful conduct, and not only a prediction that is *less accurate* than the statutory standard prescribed by the legislature. The due process clauses of both the federal and state constitutions require that future harmful sexual conduct must be highly likely in order to commit a proposed patient under the SDP Act.

## IV.

### Substantive Due Process

■ Linehan argues that, as applied to his case, civil commitment under the SDP Act violates substantive due process rights arising from the Minnesota and United States Constitutions. Linehan's primary contention is that his SDP Act commitment is not narrowly drawn to serve the state's interests because criminal sanctions are available to deter him from and, if necessary, to punish him for any future harmful sexual conduct. He asserts that he is presently competent to stand trial, able to control his sexual impulses, not mentally ill, and that he has not been acquitted of a crime on the basis of insanity. Linehan further contends that an antisocial personality disorder is an insufficient basis for the commitment of dangerous persons, and that an utter inability to control sexual impulses is required in order to satisfy the narrow tailoring demand of strict scrutiny.

■ Despite these arguments, Linehan's commitment under the SDP Act is constitutional. As applied to Linehan, the SDP Act is a narrowly tailored departure from the PP Act, which itself is a limited but valid policy of confinement and treatment for highly dangerous sexual predators. We acknowledge the constraint of substantive due process in this area of legislative action, but we conclude that there is no principled and constitu-

tionally significant distinction between Linehan's commitment under the SDP Act and the commitments of other sexual predators upheld under the PP Act. *See Blodgett,* 510 N.W.2d at 914–16. Linehan raises important issues and valid concerns in a difficult field of constitutional law. Substantive due process forecloses the substitution of preventive detention schemes for the criminal justice system, and the judiciary has a constitutional duty to intervene before civil commitment becomes the norm and criminal prosecution the exception. *See Foucha v. Louisiana,* 504 U.S. 71, 82–83, 112 S.Ct. 1780, 1786–87, 118 L.Ed.2d 437 (1992). But that is not this case.

### A.

■ Both the Minnesota and United States Constitutions protect individuals from deprivations of liberty without due process of law. U.S. Const. amends. V, XIV; Minn. Const. art. I, § 7. Both guarantees include substantive components prohibiting "certain arbitrary, wrongful government actions, 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) (citation omitted); *see State v. Guminga,* 395 N.W.2d 344, 346–47, 349 (Minn.1986). Freedom from physical restraint is at the core of the right to liberty protected by due process. *Foucha,* 504 U.S. at 80, 112 S.Ct. at 1785–86; *Youngberg v. Romeo,* 457 U.S. 307, 316, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982).

■ Because the fundamental right to liberty is at stake, the SDP Act is subject to strict scrutiny and the burden of persuasion rests with the government. *Blodgett,* 510 N.W.2d at 914; *id.* at 922 (Wahl, J., dissenting). Under strict scrutiny, challenged legislation must be narrowly tailored to serve a compelling state interest. *Young v. Weston,* 898 F.Supp. 744, 748 (W.D.Wash.1995) (invalidating a civil commitment statute for antisocial and dangerous persons); *State v. Post,* 197 Wis.2d 279, 302, 541 N.W.2d 115, 122 (1995) (upholding a civil commitment statute for mentally disordered and dangerous persons). In certain circumstances, we have also recognized that substantive due process allows a comparison of the magnitude of the liberty deprivation and of the state's interests as a guide to determining the extent of the constitutional guarantee. *See Blodgett,* 510 N.W.2d at 914, 918 (upholding the PP Act against federal and state constitutional challenges); *Guminga,* 395 N.W.2d at 348–49 (balancing public and liberty interests, in light of policy alternatives, under the state constitution).

■ Under its police powers, the state has a compelling interest in protecting the public from sexual assault. *Blodgett,* 510 N.W.2d at 914, 916. There is also a compelling interest in the care and treatment of the mentally disordered. *Cf. Addington,* 441 U.S. at 426, 99 S.Ct. at 1809–10 (noting such an interest as sufficient to justify civil commitment). Clearly, these two interests are intertwined. Treating sexual predators for the disorders that explain their dangerousness serves and falls within the state's interest in protecting the public from sexual assault. *Cf. Blodgett,* 510 N.W.2d at 916 ("[E]ven when treatment is problematic, and it often is, the state's interest in the safety of others is no less legitimate and compelling. So long as civil commitment is programmed to provide treatment and periodic review, due process is provided.").

### B.

We therefore consider whether the SDP Act is sufficiently narrow, as applied to a person suffering from APD, to satisfy strict scrutiny. The leading United States Supreme Court case on the subject of civil commitment for dangerous persons is *Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), in which the Court invoked substantive due process to invalidate the commitment of a presently sane insanity acquittee who suffered from APD. The Louisiana statute at issue required mandatory and indefinite commitment for insanity acquittees, and allowed release only if the acquittee could prove that he or she was no longer dangerous; the current sanity of the acquittee was irrelevant. *Id.* at 73, 112 S.Ct. at 1781–82. Foucha's continued commitment was based solely on his inability to demonstrate that he posed no danger to himself or to others. *Id.* at 83, 112 S.Ct. at 1787; *id.* at

86–87, 112 S.Ct. at 1788–89 (O'Connor, J., concurring). Foucha was diagnosed with APD, but the state conceded that he was no longer "mentally ill" and did not contradict the assertion that APD could not be treated. *Id.* at 75, 80, 82, 112 S.Ct. at 1782, 1785–86, 1786–87. The Court held that insanity acquittees may be committed only so long as the patient is both mentally ill and dangerous. *Id.* at 77–78, 112 S.Ct. at 1784; *see also Jones v. United States,* 463 U.S. 354, 370, 103 S.Ct. 3043, 3052–53, 77 L.Ed.2d 694 (1983); *O'Connor v. Donaldson,* 422 U.S. 563, 574–75, 95 S.Ct. 2486, 2493–94, 45 L.Ed.2d 396 (1975).

After *Foucha,* this court upheld the PP Act commitment of a convicted sex offender diagnosed with APD in *In re Blodgett,* 510 N.W.2d 910 (Minn.1994). *Blodgett* interpreted *Foucha* to permit at least three categories of confinement pursuant to a state's police powers: (1) convicted criminals may be imprisoned for purposes of deterrence and retribution; (2) the mentally ill and dangerous may be civilly committed; and (3) persons who pose a danger to others may be subject to limited confinement in certain narrow circumstances, such as pretrial detention of dangerous criminals. The PP Act was upheld either as a subset of mentally ill and dangerous commitment statutes, or as an additional category not mentioned in *Foucha. See id.* at 914.

Although the SDP Act is a departure from the PP Act, *Blodgett* is not distinguishable. Like Linehan, Blodgett was dangerous and suffered from APD; the court concluded that there was a valid mental health basis for commitment. The *Blodgett* court did note that psychopathic personality is a severe form of APD that involves a "volitional dysfunction which grossly impairs judgment and behavior with respect to the sex drive." *Id.* at 915. However, the court did not assert that an utter inability to control sexual impulses was the only constitutional basis for committing sexual predators; *Blodgett* did not indicate that substantive due process precluded milder forms of APD as the mental health basis for civil commitment. *See id.* at 916 (emphasizing that substantive due process requires a *connection* between the

medical rationale for commitment and the patient's continued loss of liberty, but not offering limits to the medical *basis* for commitment).

Other decisions make clear that civil commitment for sexual predators is allowed if treatment is necessary to abate the mental disorders that make such persons so dangerous to others. *See Call v. Gomez,* 535 N.W.2d 312, 319 (Minn.1995) (holding that PP Act patients may be confined so long as they are dangerous and need treatment, despite no longer meeting the inability-to-control requirement for initial commitment); *State v. Randall,* 192 Wis.2d 800, 806–07, 532 N.W.2d 94, 96 (1995) (holding that dangerous but sane insanity acquittees may be confined in a mental health facility so long as there is a medical justification for doing so). *Blodgett* was concerned with the reality of an identifiable mental disorder that caused a person to be sexually dangerous. *See Blodgett,* 510 N.W.2d at 914–15. The SDP Act's application to a dangerous person suffering from an antisocial personality disorder does not alter the substantive due process analysis.

We conclude that, under *Blodgett,* the SDP Act is sufficiently narrow to satisfy strict scrutiny as applied to Linehan. The SDP Act serves the same state purposes and interests as the PP Act. In fact, the SDP Act is an attempt to protect the public by treating sexual predators even more dangerous than those reached by the PP Act—the mentally disordered who retain enough control to "plan, wait, and delay the indulgence of their maladies until presented with a higher probability of success." *Linehan II,* 544 N.W.2d at 318. And as the court of appeals recognized, the mental disorder requirement in the SDP Act serves the state's interest in public safety by aiding the prediction of dangerousness. *Id.* Both the SDP Act and the PP Act apply only if a person has already engaged in a course of harmful sexual conduct, will probably do so again, and suffers from a mental disorder that explains and helps predict that person's dangerousness.

Linehan attempts to distinguish *Blodgett* by posing an underlying theory of substantive due process as applied to civil commit-

ment. Linehan argues that *Foucha* requires the state to explain why criminal law is insufficient to address dangerousness. Charge, conviction, and heightened penalties for recidivists are "the normal means of dealing with persistent criminal conduct." *Foucha*, 504 U.S. at 82, 112 S.Ct. at 1786–87. From this proposition, Linehan asserts that the state cannot satisfy the narrow-tailoring element of strict scrutiny unless the proposed patient is "unreachable" by the criminal law.

There is some force to Linehan's argument. *Foucha*'s application of strict scrutiny to the continued commitment of a sane insanity acquittee did demand sound reasons for departing from the criminal justice system in the name of public protection. Moreover, Linehan's substantive due process theory might avoid difficult constitutional issues. If every basis for civil commitment implied a defense to criminal charges, and if every criminal conviction precluded civil commitment, the judiciary might not have to inquire whether a particular mental disorder, dysfunction, or illness is acceptable under substantive due process; only the division between the two systems would be relevant. The legislature could create a mental health basis for commitment, but then a defense to criminal charges would follow. Likewise, a mental health defense to criminal charges would imply a valid basis for commitment.

Nevertheless, we believe that some overlap between the two systems is justified to adequately serve the interests of public protection and treatment.[9] And whatever its merits, Linehan's theory is foreclosed by our case law. *See Pearson*, 205 Minn. at 556, 287 N.W. at 303 (stating that an uncontrollable impulse is not a defense to a crime if the defendant was aware of the nature and quality of the act, and that a committable mental malady does not necessarily create an excuse for criminal conduct). The utter inability to control one's mental or sexual impulses is not, per se, a defense to criminal punishment

under Minnesota law. Rather, the defendant must prove that, at the time of the act, he or she could not understand the nature of the act or that the act was wrong. *See* Minn. Stat. § 611.026; *State v. Jolley*, 508 N.W.2d 770, 772 (Minn.1993); *State v. Rawland*, 294 Minn. 17, 46, 199 N.W.2d 774, 790 (1972). Nor is Linehan's proposed hermetic seal between the civil commitment and criminal justice systems mandated by state or federal due process protections. Under our case law, a person who is utterly unable to control impulses to sexually assault others does not, by that fact, have a defense to criminal charges, and yet that person may still be subject to civil commitment under the PP Act. *See* Minn.Stat. § 253B.02, subd. 18a(b); *Blodgett*, 510 N.W.2d at 914–16.

We cannot accept Linehan's theory without disrupting the result in *Blodgett*. *Blodgett* upheld the commitment of a dangerous person who suffered from APD and who lacked volitional control, but who was serving a prison sentence at the time of his commitment. *Blodgett*, 510 N.W.2d at 914–16; *see also Bailey v. Gardebring*, 940 F.2d 1150, 1153 (8th Cir.1991) (upholding dual commitment and prison confinement). The relevant feature distinguishing Linehan's case from Blodgett's is the nature of their mental disorders, not that one was "reachable" by the criminal law and the other was not. And, as we discuss below, evidence of Linehan's APD and dangerousness supplied a constitutionally adequate basis for civil commitment.

It may be true, in a certain philosophical sense, that Blodgett was less blameworthy than is Linehan because Blodgett could not control his sexual impulses. And Blodgett may have been less deterred by impending criminal sanctions. But Blodgett, like Linehan, was neither incompetent nor mentally ill, and Blodgett's inability to control his impulses was not a defense to criminal liability. The 1994 amendments to the civil commitment statute reaffirm this conclusion. Minn.

9. We doubt that the legislature would preserve the current bases for commitment if forced to create new and parallel criminal defenses. *See, e.g.,* Minn.Stat. § 253B.02, subd. 2 (allowing commitment for persons chemically dependent and dangerous to themselves or others); *id.* § 253B.02, subd. 14 (allowing commitment for persons mentally retarded and dangerous to themselves or others). A theory of due process that threatens such civil commitments seems unsound. *See Blodgett*, 510 N.W.2d at 914 n. 6 (interpreting *Foucha* in a limited fashion to avoid unintended threats to accepted bases for civil commitment).

Stat. § 253B.185, subd. 3 (declaring that satisfaction of the definition of sexual psychopathic personality or sexually dangerous person does not constitute a criminal defense). We reaffirm *Blodgett* today, and therefore Linehan's substantive due process theory is unpersuasive.

### C.

Linehan also contends that APD is, per se, an invalid basis for commitment because the diagnosis is little more than a definition of criminal behavior. We recognize that there are constitutional limits to state-created definitions of mental illness in the civil commitment context. The Supreme Court implied such limits in *Foucha*.

> [T]he State asserts that because Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely. This rationale would permit the State to hold indefinitely *any* other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct. The same would be true of *any* convicted criminal, even though he has completed his prison term. It would also be only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions and aside from permissible confinements for mental illness, incarcerates only those who are proved beyond reasonable doubt to have violated a criminal law.

*Foucha*, 504 U.S. at 82–83, 112 S.Ct. at 1787 (emphasis added); *see also id.* at 88, 112 S.Ct. at 1789–90 (O'Connor, J., concurring) ("I think it clear that acquittees could not be confined as mental patients absent some medical justification for doing so; in such a case the necessary connection between the nature and purposes of confinement would be absent."). Mere social maladjustments might not satisfy state or federal due process concerns, *see Blodgett*, 510 N.W.2d at 914, and certainly other constitutional provisions limit the government's ability to civilly commit those whom it fears. *See, e.g.*, U.S. Const. amends. I, XIV (guaranteeing freedom of speech, religion, and equal protection of the laws); Minn.Const. art. I, §§ 2, 3, 16 (same).[10]

However, substantive due process allows the legislature some flexibility to define the medical grounds for civil commitment. *See Foucha*, 504 U.S. at 80, 112 S.Ct. at 1785–86; *id.* at 87–89, 112 S.Ct. at 1789–90 (O'Connor, J., concurring) (discussing the importance and vitality of judicial deference to state legislatures); *Jones*, 463 U.S. at 364 n. 13, 370, 103 S.Ct. at 3050 n. 13, 3053 (assuring judicial deference to legislatures designing insanity defenses, an area of legislation "fraught with medical and scientific uncertainties" (citation omitted)). *Cf. Addington*, 441 U.S. at 431, 99 S.Ct. at 1812 (noting the importance federalism places on diversity in the substance and procedure of civil commitment laws). Thus, we are hesitant to restrain legislative judgment in areas of medical uncertainty. We are bound to enforce the requirements of due process, but we give the legislature due regard in identifying medically recognized mental disorders, such as APD, that explain a person's dangerousness and that are appropriate bases for civil commitment and treatment. *See* Minn.Stat. § 253B.03, subd. 7 (requiring proper care and treatment, best adapted to eliminate the need for continued confinement and care); *Call*, 535 N.W.2d at 319–20 (rejecting a dou-

---

**10.** Other opinions indicate that idiosyncratic or "unusual" behavior is not a constitutionally sufficient basis for restricting liberty. *See Addington*, 441 U.S. at 426–27, 433, 99 S.Ct. at 1809–10, 1813 (emphasizing the risks of confinement for "isolated instances of unusual conduct. Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior."); *see also Post*, 197 Wis.2d at 303, 541 N.W.2d at 122 (upholding Wisconsin's sexual predator commitment statute, but acknowledging that substantive due process requires a "mental condition component"); *In re Care & Treatment of Hendricks*, 259 Kan. 246, 277, 279–81, 912 P.2d 129, 147, 148–49 (1996) (Larson, J., dissenting) (arguing for the constitutionality of Kansas's statute, but stating that "for constitutional purposes, 'mental illness' is * * * a legal determination to be made with reference to some standard that establishes that the person suffers a condition that is an ailment of the mind, rather than mere 'idiosyncratic behavior' within a range of conduct that is generally acceptable.").

ble jeopardy challenge to the PP Act because of its treatment purposes and requirements).

Linehan relies on *Young v. Weston* for the proposition that APD is a constitutionally deficient basis for his commitment. In *Young,* a federal district court held that the State of Washington's definitions of mental "abnormalities" were unconstitutionally circular. Washington allowed civil commitment of persons convicted of or charged with a crime of sexual violence, who suffer from a mental abnormality or personality disorder that makes such persons likely to commit violent sexual offenses. Wash.Rev.Code Ann. § 71.09.020(1), (4) (West Supp.1997). The court thought that the statutory bases for civil commitment were essentially descriptions of dangerous behavior, and not medically recognizable mental illnesses. *See Young,* 898 F.Supp. at 749–50 & nn. 2–3. The statute targeted "antisocial personality features which are unamenable to existing mental illness treatment modalities." Wash. Rev.Code Ann. § 71.09.010 (providing legislative findings).

The reasoning in *Young* cannot be used to invalidate Linehan's commitment. First, adopting *Young* 's belief that substantive due process precludes "circular" definitions of mental illness seems inconsistent with this court's opinion in *Blodgett.* The "utter inability to control" test for psychopathic personalities also might be "circular" in the sense that it describes dangerous behavior as well as a mental disorder. Again, Linehan does not explain how his reasoning can be applied without disturbing the result in *Blodgett.* Second, even if the circularity argument is valid after *Blodgett,* the diagnosis of antisocial personality *disorder* applied to Linehan by the district court was not solely based on his criminal behavior. The court also relied on evidence of Linehan's mental processes in finding that he has APD, emphasizing Linehan's lack of empathy and remorse.

Moreover, the SDP Act was written with the advice of psychiatrists and psychologists who believe that *DSM–IV* offers a helpful categorization of mental disorders—"clinically significant behavioral or psychological syndrome[s] or pattern[s] * * * currently * * * considered a manifestation of a behavioral, psychological, or biological dysfunction in the individual." *DSM–IV* at xxi–xxii. Granted, a diagnosis of APD is based in part on evidence of behavior. However, the purpose and effect of the diagnostic criteria in *DSM–IV* is to identify an *underlying* mental disorder that accounts for the behavior. Linehan does not now challenge the district court's conclusion that he has such a disorder. In the absence of evidence to the contrary, we accept the legislature's and the American Psychiatric Association's determination that APD is an identifiable mental disorder that helps explain behavior.[11]

---

11. The district court did not conclude that Linehan has a "dysfunction" under the SDP Act. That language is not at issue here.

We draw support for our conclusion from other courts that have upheld commitments of dangerous persons who suffer from medically recognized mental disorders. Before *Young v. Weston,* the Washington Supreme Court upheld its sexual predator statute against a substantive due process challenge. *In re Personal Restraint of Young,* 122 Wash.2d 1, 59–60, 857 P.2d 989, 1018 (1993). The majority conceded that *Foucha* bars civil commitment on the basis of antisocial *behavior.* However, the Washington statute applied to violent sexual predators with antisocial personality *disorder,* a "recognized mental disorder" under *DSM–III–R. Id.,* 122 Wash.2d at 37 n. 12, 857 P.2d at 1006–07 n. 12; *see also id.,* 122 Wash.2d at 63–64, 857 P.2d at 1020–21 (Johnson, J., dissenting).

The Wisconsin Supreme Court upheld a similar sexual predator statute as applied to a prisoner convicted of violent sexual offenses and diagnosed with APD under *DSM–IV* criteria. The Wisconsin statute required a violent offense, a mental disorder and a substantial probability that the offender will commit future acts of sexual violence because of the disorder. Wis. Stat. Ann. §§ 980.01–.02 (West Supp.1995); *see also id.* § 980.01(2) (defining mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence"). The court acknowledged that substantive due process requires a "mental condition component" in civil commitment statutes applied to dangerous offenders, but held that this requirement was satisfied by a definition of mental disorder that targeted those predisposed to commit sexually violent acts. *Post,* 197 Wis.2d at 303, 306, 541 N.W.2d at 122, 123–24.

Amicus curiae Minnesota Civil Liberties Union (MCLU) points out that the Kansas Supreme Court recently held that the application of that state's sexual predator statute to a person with a

For these reasons, we conclude that the SDP Act, as applied to Linehan, satisfies the demands of substantive due process.

## V.

### Equal Protection

■ Linehan's second constitutional argument is that the SDP Act violates his right to equal protection of the laws. U.S. Const. amend. XIV; Minn. Const. art. I, § 2. Amicus curiae MCLU contends that the SDP Act impermissibly distinguishes between two classes of sexually dangerous persons: (1) those who suffer from a sexual, personality, or other mental disorder or dysfunction, Minn.Stat. § 253B.02, subd. 18b(a)(2), and (2) those who do not. Only the first class is subject to civil commitment under the SDP Act. MCLU argues that the Act fails to satisfy strict scrutiny because the classifications are underinclusive: it may be that many sex offenders who are as likely to reoffend as Linehan do not suffer from mental, sexual, or personality disorders.[12]

■ Again, *Blodgett* controls our analysis. There, we recognized that civil commitment for sexual predators threatens liberty, and therefore such schemes must satisfy heightened scrutiny under state and federal equal protection principles. *See Blodgett*, 510 N.W.2d at 917 (departing from the rational basis standard in *Pearson*, 309 U.S. at 274–75, 60 S.Ct. at 525–26). *Blodgett* concluded that the PP Act, as interpreted by *Pearson*, permissibly drew genuine and substantial distinctions that define a class of dangerous and mentally disordered persons who victimize others in a particular manner. The PP Act addressed the threat of sexual predators who pose a unique danger. *Id.* Therefore, heightened scrutiny, not strict scrutiny, is applicable to the SDP Act. The "genuine and substantial" standard used in *Blodgett* is a form of intermediate scrutiny under the Minnesota Constitution. *See State v. Russell*, 477 N.W.2d 886, 889 (Minn.1991), *cited in Blodgett*, 510 N.W.2d at 917. Deference to the legislature is due, and the statute's genuine and substantial distinctions must be reasonably connected to achieving the state's legitimate purposes. *See Russell*, 477 N.W.2d at 888–89.[13]

The legislature had sufficient basis to conclude that interests in public protection and treatment would be reasonably served by a distinction between sexually dangerous persons with and without mental disorders. First, the legislature has concluded that applying civil commitment to those with mental disorders helps isolate sexually dangerous persons most likely to harm others in the future. Although the SDP Act already requires that future harmful sexual conduct must be highly likely, the existence of a mental disorder such as APD identifies a

"mental abnormality" violated substantive due process. The court interpreted *Foucha* to require some form of "mental illness" before commitment for dangerousness is permissible. *Hendricks*, 259 Kan. at 255, 260–61, 912 P.2d at 135, 137–38. Because Hendricks was not mentally ill under the legislature's own definition, the court held that Hendricks's confinement violated substantive due process. *See id.*, 259 Kan. at 261, 912 P.2d at 138.

*Hendricks* is not persuasive in light of our precedent. Like *Hendricks*, *Blodgett* noted that mental illness combined with dangerousness is an alternative basis for civil commitment under state law. *Blodgett*, 510 N.W.2d at 914. Still, *Blodgett* upheld the PP Act commitment. *Id.* at 914–16. A legislative definition of mental illness in one part of the civil commitment statute does not preclude other mental health bases for commitment. The MCLU's reasoning is unavailing after *Blodgett*.

12. MCLU also asserts that the Act might be overinclusive because many sex offenders with personality disorders are not dangerous. This argument is unconvincing because the SDP Act confines its application to those who are highly likely to sexually harm others. Minn.Stat. § 253B.02, subd. 18a(a)(3).

13. The United States Supreme Court has not established a scrutiny level under the federal constitution in this context. *See Foucha*, 504 U.S. at 85–86, 112 S.Ct. at 1788–89 (plurality opinion) (demanding a "particularly convincing reason" for imposing a burden of proof on sane insanity acquittees seeking release that is not demanded of the merely dangerous); *id.* at 88, 112 S.Ct. at 1789–90 (O'Connor, J., concurring) (concluding that equal protection analysis was unnecessary); *Jones*, 463 U.S. at 365 n. 13, 103 S.Ct. at 3050 n. 13. *Blodgett* held that the standard of scrutiny under the state constitution is at least as searching as the standard under the federal constitution. *See Blodgett*, 510 N.W.2d at 917. Therefore, we follow *Blodgett* and apply heightened scrutiny under both the state and federal constitutions.

cause of enduring harmful behavior. The legislature's judgment regarding the relationship between mental disorders and dangerousness is sufficient under heightened scrutiny. *See Blodgett,* 510 N.W.2d at 917; *see also Foucha,* 504 U.S. at 87, 112 S.Ct. at 1789 (O'Connor, J., concurring).

 Second, the state's interest in treating sexual predators is served by confining the scope of the SDP Act to those with mental disorders. The state appears to assert this interest by emphasizing the substantial commitment the legislature has made to creating adequate facilities and treatment programs for those committed under the PP and SDP Acts. The state has an obvious interest in treating sexual predators for their mental disorders before they harm others again. *See Addington,* 441 U.S. at 426, 99 S.Ct. at 1809–10 (discussing parens patriae powers); *In re Young,* 122 Wash.2d at 26, 857 P.2d at 1000 ("[I]t is irrefutable that the State has a compelling interest both in treating sex predators and protecting society from their actions."). Rather than rely exclusively on enhancing sentences for sex-related crimes, the legislature has also opted to provide comprehensive care and treatment for committed sex offenders at MSH and at a new treatment center in Moose Lake. *See Call,* 535 N.W.2d at 318–19 & n. 5; *Minnesota Security Hospital, Sex Offender Treatment Program: Plan, Content and Sequence* 1–2, 6.

The state adds that substantive due process requires the classifications challenged by Linehan: civil commitment is not available as a tool for protecting the public unless the proposed patient is both dangerous and suffering from a mental disorder. *Foucha,* 504 U.S. at 77–78, 112 S.Ct. at 1784. In essence, the state contends that Linehan's substantive due process rights preclude equal protection analysis. We have difficulty accepting this conclusion. It is far from clear that a constitutionally imposed *limitation* on legislative classifications creates a compelling state *interest* to justify those classifications. Constitutional rights and state interests are distinct concepts.

Nevertheless, the SDP Act's classification is sufficiently justified by *Blodgett* and the reasonable connection between a proposed patient's mental disorder and the state's interests in public protection and treatment. Therefore, the Act does not violate Linehan's rights to equal protection.

## VI.

### Ex Post Facto and Double Jeopardy

MCLU also asserts that the SDP Act and its application to Linehan constitutes enhanced or additional criminal punishment under the Ex Post Facto and Double Jeopardy Clauses of the United States Constitution. U.S. Const. art. I, § 10; *id.* amends. V, XIV. Both clauses apply only to criminal and predominantly punitive civil laws. Because the SDP Act was an amendment to a civil statute (chapter 253B) and thus facially civil, Linehan must offer the "clearest proof" that the Act is sufficiently punitive in purpose or effect to negate its civil label. *United States v. Ward,* 448 U.S. 242, 248–51, 100 S.Ct. 2636, 2641–43, 65 L.Ed.2d 742 (1980) (citation omitted).

### A.

 Article I, Section 10 of the federal constitution prohibits ex post facto laws, which include laws that increase the punishment for crimes committed before enactment. *Collins v. Youngblood,* 497 U.S. 37, 42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990). The protection ensures fair warning of criminal sanctions, and restrains "arbitrary and potentially vindictive legislation." *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (explaining that ex post facto laws must be criminal, apply to past conduct, and disadvantage the offender). The initial question is whether the SDP Act is sufficiently punitive in purpose or effect.

MCLU does not address *Blodgett,* 510 N.W.2d at 916, which emphasized that treatment after commitment is required, or *Call,* 535 N.W.2d at 319–20, which upheld a PP Act commitment against a double jeopardy challenge. *Call* concluded that the purpose of the PP Act is treatment, not preventive detention. *See id.* (assuming that the argument could be raised). *Call* also described

the state's substantial efforts to treat and rehabilitate sex offenders. *Id.* at 318–19 & n. 5. Under the civil commitment statute, all patients have the right to receive "proper care and treatment, best adapted, according to contemporary professional standards, to rendering further custody, institutionalization, or other services unnecessary." Minn. Stat. § 253B.03, subd. 7. Patients are also entitled to a written program plan articulating treatment goals, duration, and measures to be employed, and a quarterly progress review. *Id.* The SDP Act ensures treatment to the same extent as the PP Act. *See id.* §§ 253B.18, 253B.185, subd. 1.

Moreover, after 2 years of work, the staff of the Minnesota Security Hospital developed a four-phase treatment program for sex offenders committed to MSH, and a similar program is being developed at the Minnesota Psychopathic Personality Treatment Center (MPPTC) in Moose Lake. *Sex Offender Treatment Program, supra,* at 1, 26, 29. According to evidence introduced at Linehan's initial commitment hearing, each of the four phases will last approximately 8 months for model patients—those who complete the program's therapy and education requirements, satisfy the program's goals, and behave consistent with program standards. *Id.* at 6. In fact, treatment and rehabilitation are essential to MSH's mission. *Id.* at 2, 8 ("Residents have a right to treatment."). The purpose and effect of the SDP Act is therefore predominantly remedial, not punitive.

This conclusion is in accord with *Allen v. Illinois,* 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986). In *Allen,* the Court held that confinement and treatment of sexually dangerous persons under the Illinois sexual predator statute was civil in nature. *Id.* at 369–75, 106 S.Ct. at 2992–95. The Illinois statute provided for mandatory treatment at a psychiatric care facility and for full discharge when the patient demonstrated that he or she was no longer dangerous. *See id.* at 369–70, 106 S.Ct. at 2992–93.

MCLU notes that the SDP Act requires that a prison sentence be completed at a facility designated by the Commissioner of Corrections if the patient was committed to the commissioner before the SDP Act peti-

tion. *See* Minn.Stat. § 253B.185, subd. 2(b). However, the SDP Act does not, by its terms, require that any outstanding criminal sentence be served at a correctional facility. Moreover, the lower courts in this case did not invoke the provision cited by MCLU. Linehan was ultimately committed to the MSH and to the MPPTC. Both institutions are managed by the Commissioner of Human Services, and both must provide care and treatment. *Id.* §§ 246B.02–.04, 253.20–202; *Call,* 535 N.W.2d at 318–19 & n. 5; *Blodgett,* 510 N.W.2d at 916 (holding that due process is satisfied by a commitment system "programmed to provide treatment and periodic review"); *Sex Offender Treatment Program, supra,* at 2, 8.

### B.

The protection against double jeopardy in the Fifth Amendment to the federal constitution applies to the states through the Fourteenth Amendment. *See Benton v. Maryland,* 395 U.S. 784, 794–96, 89 S.Ct. 2056, 2062–64, 23 L.Ed.2d 707 (1969). MCLU asserts that Linehan's commitment constitutes a second punishment for past convictions. To prevail, Linehan must show that the civil "penalty" was (1) punishment, (2) imposed in a separate proceeding, and (3) based on the same offense for which the proposed patient was already placed in jeopardy. *United States v. Halper,* 490 U.S. 435, 438, 440–41, 448–51, 109 S.Ct. 1892, 1896, 1897–98, 1901–03, 104 L.Ed.2d 487 (1989).

As above, Linehan fails to demonstrate that his commitment under the SDP Act is "punishment." *See id.* at 448–49, 109 S.Ct. at 1901–02 (explaining that a civil sanction violates double jeopardy only if it "may not fairly be characterized as remedial, but only as a deterrent or retribution"). *Call* concluded that the PP Act did not violate double jeopardy because the commitment was for the purpose of treatment. Our decision was not affected by Call's incarceration at the time of commitment. *See Call,* 535 N.W.2d at 319–20. As we noted above, the procedures and treatment after commitment under the SDP Act are identical to those of the PP Act. *See Young,* 898 F.Supp. at 753–54 (using the same analysis of punitiveness for

both ex post facto and double jeopardy purposes).

Linehan has not offered evidence that the treatment regime at MSH or MPPTC is a sham, or even that such treatment is ineffective. On the record before us and in light of our conclusion in *Call*, we conclude that the SDP Act is facially civil and is not so punitive in purpose or effect to trigger the federal constitutional prohibitions against ex post facto laws and double jeopardy.

## VII.

### Sufficiency of the Evidence

■ Linehan also argues that certain findings of fact were clearly erroneous. On appeal, we will not weigh the evidence. We will determine if the evidence as a whole presents substantial support for the district court's conclusions. *Johnson v. Noot*, 323 N.W.2d 724, 728 (Minn.1982).

### A.

■ First, Linehan asserts that the county failed to prove highly likely future harm by "state of the art" evidence or the "best available scientific knowledge and methodology." Linehan argues that "actuarial" methods of prediction founded on base rate recidivism statistics are more accurate than "clinical" predictions, and therefore dangerousness predictions must rely on the former.[14] The only base rate statistic noted in the district court opinion was the 7.7% 3-year rapist rearrest rate. The court discounted the weight of that statistic for several convincing reasons, which we have already detailed. Nevertheless, Linehan argues that a base rate is required for dangerousness prediction, and that the county had the burden of establishing another statistic if it believed 7.7% was too low.

We note first that the district court's dangerousness finding is not a purely "clinical" prediction. The district court's opinion analyzed both base rate statistics and case-specific facts. According to testimony at the hearing, some research on violence prediction indicates that *combining* actuarial methods with the clinician's experience and knowledge of the peculiar circumstances of a given case may enhance accuracy. Moreover, contrary to Linehan's claim, the county's experts did not rely "exclusively on clinical prediction." Dr. Millard and Dr. Fox both considered base rate statistics.

Linehan offers no statutory or precedential support for the argument that actuarial methods or base rates are the sole permissible basis for prediction. In fact, Linehan's argument is contrary to the multi-factor analysis for dangerousness prediction outlined in *Linehan I*, 518 N.W.2d at 614. *Linehan I* offered six potential inquiries to aid courts in predicting whether future harm was likely under the PP Act. *Id.* These factors must be considered when such evidence is presented at a hearing, and they are particularly important when the last instance of harmful sexual conduct is remote in time from the petition for commitment. *Id.* Statistical evidence of recidivism is only one of the six factors. In this case, the district court properly followed *Linehan I* and evaluated evidence pertaining to each of the six factors for prediction. It was not error to consider evidence not specifically listed in *Linehan I*. If nothing else, the hearing in this case demonstrated that dangerousness prediction methodology is complex and contested. *Linehan I* did not foreclose good faith attempts by the courts to isolate the most important factors in predicting harmful sexual conduct. We conclude that the guidelines for dangerousness prediction in *Linehan I* apply to the SDP Act, and therefore we cannot accept Linehan's attempt to confine the district court's inquiry. On these facts, we are unpersuaded that *Linehan I* should be modified.

### B.

■ Linehan also claims that the district court findings lack specificity. First, Linehan emphasizes that the district court did not

14. According to testimony at the hearing, clinical predictions are based on the clinician's observations, experience, and knowledge about the subject of predictions or about individuals in particular classes, such as rapists or child molesters. Actuarial predictions are based on statistics that can be determined mathematically (*e.g.*, age and the number of previous offenses), and on a formula for evaluating the significance of such variables.

identify the crimes listed in Minn.Stat. § 253B.02, subd. 7a that Linehan is likely to commit. Linehan seems to argue ·that the risk of "low-level, non-violent" acts should not be included in light of the supposed purpose of the SDP Act to commit only the most dangerous sexual predators. But whatever the purposes of the Act, the scope of the statute is clear. Nonviolent but sexually harmful acts are included in its reach. *See id.* The Act calls for a general determination that seriously harmful sexual conduct is highly likely to occur. Therefore, the district court's conclusion that Linehan was highly likely to engage in such conduct was adequate.

Second, Linehan notes that the "time horizon" for the district court's prediction is indefinite. However, the Act does not limit the prediction by time period. In addition, the Act does not incorporate the factual specificity requirements for the commitment of mentally retarded, mentally ill, or chemically dependent persons. *See id.* § 253B.09, subd. 2 (requiring specific findings and identification of the patient's conduct that formed the basis for a commitment order).

Third, Linehan asserts that the district court failed to make sufficiently specific findings regarding the causal link between the likelihood of sexually harmful conduct and his past conduct or his personality disorder. However, the factors in *Linehan I* and others balanced by the district court are appropriate for predicting dangerousness under the SDP Act. Their consideration satisfies the statute. We have demanded nothing more in PP Act commitments, and, as noted above, the factual specificity requirements for other civil commitment findings were not adopted in the SDP Act. *See id.* §§ 253B.09, subd. 2, 253B.18, subd. 1, 253B.185, subd. 1.

Linehan also asserts that his past sexual violence was caused by anger and shame, not his APD. However, finding that anger and shame played *a role* in Linehan's *prior* harmful sexual conduct is not inconsistent with finding that Linehan's APD will result in *future* harmful sexual conduct. These two motivating factors are not mutually exclusive. The district court had sufficient evidence to conclude that APD and the enduring pattern of behavior it can cause makes Linehan highly likely to sexually harm others in the future.

### C.

Linehan also challenges six factual findings underlying the district court's conclusion that he is highly likely to sexually harm others if he is not committed for treatment. Reviewing for clear error, we find sufficient evidence in the record to uphold the court's findings.

First, the district court inferred from the videotape of Linehan masturbating after vigorous play with his stepdaughter that he was still attracted to young girls. This inference was permissible even if Linehan's group therapist at Residence 4 had not noted any such attraction on other occasions. The court based its opinion on Linehan's sudden departure to the upstairs bathroom during a time-limited visit. Second, there was adequate evidence that Linehan lacks truthfulness in sexual matters. Linehan testified that he masturbated at Residence 4, but he told Dr. Millard, "You probably won't believe it, but I don't." Third, as Linehan concedes, there was evidence in the record that he continues to lack remorse for his past course of harmful sexual conduct. The court heard testimony that Linehan recently said that T.L. "deserved what she got," and that Linehan still does not accept that he has caused more than 12 hours of misery to others. Fourth, whatever weight the court placed on Linehan's irritability and verbal aggressiveness during confinement, the record supports the conclusion that such incidents occurred. Fifth, the court used Linehan's age as a factor *against* commitment. Linehan believes that the evidence deserves more weight, but that determination was largely for the district court and its assessment of expert testimony. Minn.R.Civ.P. 52.01; *Oliver Iron Mining Co. v. Commissioner of Taxation*, 247 Minn. 6, 23–24, 76 N.W.2d 107, 118 (1956).

Sixth, there was sufficient evidence to conclude that Linehan is not presently willing to participate in Alcoholics Anony-

mous. It seems that the district court's assertion that Linehan believes he has "licked" his alcohol problem was based on the phrase of a county attorney. Nevertheless, the transcript of Linehan's examination with Dr. Millard indicates that Linehan believes he can control his urge to drink without external support, although he claimed that if he "started thinking about drinking" he would "go back to AA before [he] let it get out of hand." Furthermore, a 1993 psychological review indicated that Linehan no longer participated in Alcoholics Anonymous because he does not believe that alcoholism is a disease. He also said that he relied on self control to prevent himself from returning to alcohol.

 Finally, Linehan asserts that the evidentiary standard used by the district court would allow almost any criminal to be civilly committed. We disagree. A thorough review of the record demonstrates the strength of the county's case for Linehan's commitment. Linehan has a long history of harmful sexual conduct, and the only opportunity for him to harm the public in the last 30 years was when he escaped from Stillwater's minimum security facility. Within 11 days, he committed another sexual assault. Since Linehan was returned to custody, he has displayed less overt but persuasive signs of his dangerousness. In the last 2 years, Linehan expressed his absence of remorse and empathy. Linehan also recently displayed a continuing attraction to young girls; the district court identified three instances over a 2–day period of Linehan masturbating within minutes of vigorous play with his stepdaughter. Furthermore, Linehan's failure to engage in treatment opportunities and lack of truthfulness about sexual matters are additional evidence that his commitment for treatment was proper.

Dangerousness prediction under the SDP Act is a difficult task that the legislature has delegated to district courts. In this case, the district court had to evaluate 20 days of testimony during Linehan's initial commitment hearing. The evidence was voluminous and complex, but the record against Linehan was sufficient to civilly commit him. The district court's careful balancing of all the relevant facts does not imply that the clear and convincing evidence standard was not properly applied. Contrary to Linehan's assertions, dangerousness prediction under the SDP Act is not simply a matter for statisticians. See Linehan I, 518 N.W.2d at 614.

## VIII.

Linehan's commitment under the SDP Act does not violate his rights to substantive due process or equal protection of the laws. The Act has not been shown to be so punitive that it constitutes an ex post facto law or violates the prohibition against double jeopardy. Finally, the district court did not clearly err in its findings of fact.

Affirmed.

BLATZ, J., took no part in the consideration or decision of the case.

TOMLJANOVICH and PAGE, JJ., dissent.

TOMLJANOVICH, Justice (dissenting).

The case before us illustrates better than most that the judicial power is often difficult in its exercise. * * * The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result.

*Texas v. Johnson,* 491 U.S. 397, 420, 421, 109 S.Ct. 2533, 2548, 105 L.Ed.2d 342 (1989) (Kennedy, J., concurring).

By affirming the trial court's civil commitment of Dennis Darol Linehan under the Sexually Dangerous Person's Act ("SDP Act"), this court today chooses to make the easy decision. Not because it is right, not because it is compelled by the constitutions of either the United States or Minnesota, but because it is convenient. The United States Supreme Court in its affirmation of *Pearson* asserted that it was this court's duty to "protect appellant in every constitutional right he possesses." *State ex rel. Pearson v. Probate Court of Ramsey County,* 309 U.S. 270, 277, 60 S.Ct. 523, 527, 84 L.Ed. 744 (1940), *aff'g* 205 Minn. 545, 287 N.W. 297 (Minn.1939). Likewise, the state admitted during oral ar-

gument in the case at bar that "it is the function of the courts" to provide safeguards against the state's improper use of civil commitment as a constitutionally invalid form of preventive detention.[1] Yet today this court not only shirks its duty to uphold appellant's right to substantive due process as mandated by the Supreme Court, it fails to provide a constitutionally necessary check upon the state's restriction of appellant's liberty. Even worse, the majority reaches this conclusion by relying almost entirely upon *In re Blodgett*, 510 N.W.2d 910 (Minn.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994), a case decided eight months before passage of the SDP Act, and six months before this court found that the appellant did not fit within the statute upheld in *Blodgett*. *In re Linehan*, 518 N.W.2d 609 (Minn.1994), *reh'g denied,* (Aug. 15, 1994) (*Linehan I*). And what is the basis upon which the majority reaches this conclusion? It is the fear of Dennis Darol Linehan and what he might do upon his release.

Before reaching the constitutional issue of substantive due process, which by itself invalidates the application of the SDP Act to the appellant, it is important to clarify that this court's prior decisions regarding the Psychopathic Personality Commitment Act ("PP Act") do not mandate, as the majority would have us believe, today's holding regarding the SDP Act. If anything, this court's holdings in *Pearson* and *Blodgett* require us to conclude that the SDP Act is unconstitutional as applied to the appellant.

## I. Precedent

It all started in 1939 when the legislature passed the PP Act after recognizing a "need for legislation to deal with sex offenders and a belief, shared in by the medical authorities and others, that sex crimes are committed because of a weakness of the will as well as of the intellect." *State ex rel. Pearson v. Probate Court of Ramsey County*, 205 Minn. 545, 545, 287 N.W. 297, 298 (1939), *aff'd,* 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). The statute effectively allowed the state to civilly commit those persons found to have a "psychopathic personality," which the statute defined as:

> [T]he existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of his acts, or a combination of any such conditions, as to render such person irresponsible for his conduct with respect to sexual matters and thereby dangerous to other persons.

Psychopathic Personality Act, 1939 Minn. Laws, ch. 369 (codified as amended at Minn. Stat. § 526.09–526.10 (1992)). Upon a constitutional challenge for vagueness, this court stated that the statute "was imperfectly drawn," and therefore redefined "psychopathic personality" as including only those persons who:

> by a habitual course of misconduct in sexual matters, have evidenced an *utter lack of power to control their sexual impulses* and who, as a result, are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire.

*Pearson*, 205 Minn. at 555, 287 N.W. at 302 (emphasis added).[2] Since that time, courts have considered the "utter lack of power to control their sexual impulses" to be a necessary criterion for civil commitment under the PP Act. *E.g., Pearson*, 309 U.S. at 273, 60

---

1. During oral argument, Justice Anderson stated:

 We're all familiar with the Soviet Union gulag and Nazi Germany. * * * Let's say people had antisocial conduct, dysfunctional in that particular society, and the state wanted to put them away for indeterminate confinement. * * * What are the safeguards here that would prevent that from happening in our society under a statute such as this?

 In response, assistant attorney general John Kirwin said:

 You, your honor. I think it is the function of the courts to draw those lines. * * * Asking,

'At what level does the harm become so great that it's constitutional to have a civil commitment statute like this?' * * * By its nature that standard is going to require the court to make some difficult decisions sometimes.

2. As a further limitation on the permissible reach of the statute, this court said "[i]t would not be reasonable to apply the provisions of the statute to every person guilty of sexual misconduct nor even to persons having strong sexual propensities." *Pearson*, 205 Minn. at 555, 287 N.W. at 302.

S.Ct. at 525 ("[W]e must take the statute as though it read precisely as the highest court of the State has interpreted it."); *Linehan I,* 518 N.W.2d at 613 (stating that "testimony * * * fails to support the trial court's finding that appellant exhibits an utter lack of control over his sexual impulses"); *see also* Minn.Stat. § 253B.02, subd. 18a (1994) (incorporating the "utter lack of power to control sexual impulses" language into the PP Act).

The next significant case in which this court considered the constitutionality of the PP Act was *In re Blodgett,* only this time, the question was whether the statute as interpreted in *Pearson* remained valid in light of the Supreme Court's holding in *Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). *Blodgett,* 510 N.W.2d at 914. In *Foucha,* the Supreme Court held that Louisiana could not continue to hold a presently sane insanity acquittee without violating his fundamental right to liberty. *Foucha,* 504 U.S. at 78–83, 112 S.Ct. at 1784–87. More particularly, the Court ruled that a state could constitutionally deprive an individual of his or her fundamental right to liberty under only three circumstances: (a) imprisonment of convicted criminals for the purpose of deterrence and retribution; (b) confinement of persons shown to be mentally ill and dangerous by clear and convincing evidence; and (c) detention of persons who pose a danger to others or to the community, and then only in extremely limited circumstances such as pretrial detention. *Id.* at 80, 112 S.Ct. at 1785–86. The appellant in *Blodgett* argued that his commitment was unconstitutional under *Foucha* because it did not fit within the second of *Foucha*'s three circumstances.[3] Although it was conceded that he fit within the statute's definition of psychopathic personality,[4] the appellant argued he was not mentally ill.[5] *Blodgett,* 510 N.W.2d at 914. This court did not agree, and held that Blodgett's commitment under

the PP Act was constitutionally consistent with *Foucha* because "[w]hatever the explanation or label, the 'psychopathic personality' is an identifiable and documentable violent sexually deviant condition or disorder." *Id.* at 915. In other words, this court held that the criteria required by *Pearson* to prove a "psychopathic personality" were sufficiently similar to those criteria required under *Foucha* to prove mental illness. *Id.* ("The problem is not what medical label best fits the statutory criteria, but whether these criteria may, constitutionally, warrant civil commitment.") What was essential to this court's holding in *Blodgett,* and what the majority today fails to recognize, is that the criteria used to prove that the appellant in *Blodgett* fit within the restraints of *Foucha* necessarily included the finding that Blodgett had an uncontrollable sexual impulse dangerous to others (in other words, a psychopathic personality). *Id.* at 915 ("[O]ur legislature has provided for commitment of the 'psychopathic personality' who, because of an uncontrollable sexual impulse, is dangerous to the public."). Although the majority today would have us believe that *Blodgett* stood for the proposition that appellant's diagnoses of APD would be enough to satisfy the mental-illness requirement of *Foucha,* the words of *Blodgett* negate this conclusion:

> A person committed as a psychopathic personality may petition the Commissioner of Human Services at any time for a transfer to an open hospital or for a provisional discharge to a community or other residential treatment facility, or for a temporary pass. These relaxations of security hospital confinement provide an opportunity (and an incentive) for the committed person to demonstrate that he has *mastered his sexual impulses* and is ready to take his place in society.

*Id.* at 916 (emphasis added). In other words, a person committed as a psychopathic personality who *learns to control his sexual*

---

3. Neither the appellant nor the state argued that a commitment under the PP Act would have fit under either of *Foucha*'s other two categories.

4. The trial court found that the appellant met the criteria for psychopathic personality under the standard imposed by *Pearson.* On appeal to this court, the appellant did not challenge the finding

that he had "an uncontrollable sexual impulse dangerous to others." *Blodgett,* 510 N.W.2d at 912.

5. Like Linehan, Blodgett suffered from an antisocial personality disorder.

*impulses* no longer requires civil commitment. In fact, this was the very situation in *Linehan I*, when this court held that Linehan did not fit within the statute's definition of "psychopathic personality" precisely because the state failed to prove he was unable to control his sexual impulses. *Linehan I*, 518 N.W.2d at 614 ("Because we hold that the county did not prove the utter lack of control/uncontrollable element of the *Pearson* test, it is unnecessary to address whether there is clear and convincing evidence that appellant was likely to engage in future dangerous behavior."). Although Linehan, like Blodgett, was diagnosed with APD, this court found that the state failed to prove he was utterly unable to control his sexual desires. *Id.* Consequently this court held that Linehan was different from Blodgett and could not be committed as a psychopathic personality.[6] *Id.*

Of course that was not the end of *In re Linehan*. The legislature subsequently passed the SDP Act and provided civil commitment for those found to be sexually dangerous persons ("SDP"). *See* Sexually Dangerous Persons Act of August 31, 1994, ch. 1, art. 1, § 3–4, 1995 Minn. Laws 1st Spec. Sess. 5–7 (1994), *codified at* Minn.Stat. §§ 253B.02, 253B.185 (1994). Under the new law, the state needed to show that the person has engaged in a course of harmful sexual conduct, and that the person has manifested a "sexual, personality, or other mental disorder or dysfunction, and as a result, is likely to engage in acts of harmful sexual conduct." Minn.Stat. § 253B.02, subd. 18b(a) (1994). The law additionally provides that for the purposes of proving a SDP, the state need not show that the person has an inability to control his or her sexual impulses. Minn. Stat. § 253B.02, subd. 18b(b) (1994).

What the legislature in essence did was throw out the "utter lack of power to control their sexual impulses" requirement: a requirement this court created to uphold the

PP Act against an attack for vagueness in *Pearson;* a requirement this court relied upon to uphold the PP Act against an attack for substantive due process, equal protection, ex post facto and double jeopardy violations in *Blodgett;* and a requirement this court cited to release the committee in *Linehan I*. Yet today this court says the "utterly unable to control" element is of "no principled and constitutionally significant distinction between Linehan's commitment under the SDP Act and the commitments of other sexual predators upheld under the PP Act." *Ante,* at 180. Furthermore, the majority states that *Blodgett* stands for the proposition that APD alone is "a valid mental health basis for commitment" and that substantive due process does not preclude "milder forms of APD as the mental health basis for civil commitment." *Ante,* at 182. Of course the majority fails to recognize that *Blodgett* involved a psychopathic personality and does not require this court to hold that APD alone is a sufficient mental-health basis for commitment.

That is why it is disingenuous, and perhaps a little too convenient, to assert, as the majority does, "that under *Blodgett* the SDP Act is sufficiently narrow to satisfy strict scrutiny as applied to Linehan." *Ante,* at 182. This court in *Blodgett* upheld the commitment of the appellant only because he had a psychopathic personality, in other words, because he had an utter lack of power to control his sexual impulses. Despite the majority's holding that *Blodgett* stands for the proposition that APD alone fits within the mental-illness requirement of *Foucha,* the fact remains that if *Blodgett* stood for such a proposition, it would have been contrary to rulings by the U.S. Supreme Court. *Foucha,* 504 U.S. at 82–83, 112 S.Ct. at 1786–87 (stating that substantive due process does not allow a state to civilly commit a person with "a *personality disorder* that may lead to criminal conduct" (emphasis added)).[7] This

---

6. The majority concedes this point by stating that "[i]t may be true, in a certain philosophical sense, that Blodgett was less blameworthy than is Linehan because Blodgett could not control his sexual impulses."

7. If it was clear that *Foucha* stood for the proposition that a mental disorder alone was a sufficient mental-illness justification for civil commitment, then there is no reason why the U.S. Supreme Court would have granted certiorari in *Matter of Care and Treatment of Hendricks,* 259 Kan. 246, 912 P.2d 129 (1996) (striking down

court merely asserted in *Blodgett* that it would not embroil itself in a semantic argument based upon labels, and that it would analyze the appellant against the criteria used to identify a mental illness in *Foucha.* But now this court is using the label "antisocial personality disorder" to conclude that Linehan fits within *Foucha*'s definition of mental illness.

> In the absence of evidence to the contrary, we accept the legislature's and the American Psychiatric Association's determination *that APD is an identifiable mental disorder* that helps explain behavior.

*Ante,* at 185 (emphasis added). Although the majority is wont to admit as much, such a holding necessarily negates *Pearson* and grossly expands *Blodgett.* Even more importantly, it erodes the protections of substantive due process as established by *Foucha.*

## II. Substantive due process

*Foucha* stands for the proposition that a state cannot deprive a person of his or her liberty simply because that person is. dangerous. Put another way, the Due Process Clause of the Constitution prohibits us as a society from locking up persons simply because we fear them. It matters not if our fear is based upon a rational assessment of the person's likelihood to commit future bad acts, the fact remains that the Supreme Court has said we cannot remove a person from society for the sole purpose of preventing the future bad acts, even if the future bad acts are almost certain to occur. That is the baseline from which this court is required to begin its analysis of the SDP Act.

To that end, the majority correctly admits that the SDP Act deprives an individual of the fundamental right to liberty and therefore is subject to strict scrutiny. The majority also correctly adopts the form of strict scrutiny that asks whether the action is narrowly tailored to serve a compelling state interest. The majority then recognizes that the state has two compelling interests in this case: 1) to ensure public safety from sexual

assaults under the police powers and 2) to provide care and treatment of the mentally disordered. What the majority fails to recognize, however, is that the validity of the state's action will vary depending upon which compelling interest the state is trying to serve.

If the state is attempting to serve only the first compelling interest, in other words it is trying only to protect the public from future sexual assaults, it cannot deprive a person of his liberty without first obtaining a criminal conviction for past acts. *Foucha,* 504 U.S. at 77–78, 112 S.Ct. at 1784 (holding that dangerousness alone is not sufficient to *civilly* commit a person); *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (holding that a state could not continue to hold a person incompetent to stand trial); *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966) (holding that a state cannot continue to deprive a convicted criminal nearing the end of his penal term of his liberty without first committing him *civilly* ). If, however, the state is attempting to serve both the first and second compelling interests, in other words, it is attempting to provide care and treatment for a mentally ill person who poses a threat to himself and others, it can deprive a person of his liberty once it demonstrates by clear and convincing evidence that the person is both mentally ill and dangerous. *Foucha,* 504 U.S. at 77–78, 112 S.Ct. at 1784; *Jones v. United States,* 463 U.S. 354, 369, 103 S.Ct. 3043, 3052, 77 L.Ed.2d 694 (1983); *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *see also Young v. Weston,* 898 F.Supp. 744, 748–49 (W.D.Wash.1995) (listing circumstances in which the Supreme Court has allowed incarceration for nonpunitive reasons); *State v. Randall,* 192 Wis.2d 800, 532 N.W.2d 94, 100–01 (1995) (stating that Supreme Court has held that states can treat civil and criminal committees differently). The majority in *Foucha* put it this way:

> A State, pursuant to its police power, may of course imprison convicted criminals *for the purposes of deterrence and retribu-*

Kansas statute nearly identical to SDP Act), *cert. granted,* —— U.S. ——, 116 S.Ct. 2522, 135

L.Ed.2d 1047 (1996).

tion. But there are constitutional limitations on the conduct that a State may criminalize. Here *the State has no such punitive interests.* As Foucha was not convicted, he may not be punished. * * *

The State may also confine a mentally ill person if it shows 'by clear and convincing evidence that the individual is mentally ill and dangerous.' Here, the state has not carried that burden; indeed, the state does not claim that Foucha is now mentally ill.

*Foucha,* 504 U.S. at 80, 112 S.Ct. at 1785 (citations omitted) (emphasis added). Although the Supreme Court was divided in *Foucha,* it was unanimous in concluding that strict scrutiny requires a state's action to be narrowly tailored to the *particular* compelling interest at stake. Justice O'Connor in her concurrence stated "that acquittees could not be confined as mental patients absent some medical justification for doing so; in such a case the *necessary connection between the nature and purposes of confinement* would be absent." *Id.* at 88, 112 S.Ct. at 1789–90 (O'Connor, J., concurring) (emphasis added). Justice Kennedy, in fact, based his entire dissent on the fact that the validity of a state's actions will differ depending upon whether it is acting in a criminal or civil context.

> The criminal law defines a discrete category of conduct for which society has reserved its greatest opprobrium and strictest sanctions; past or future dangerousness, as ascertained or predicted in civil proceedings, is different in kind. * * * In the civil context, the State acts in large part on the basis of its *parens patriae* power to protect and provide for an ill individual, while in the criminal context, the State acts to ensure the public safety.

*Id.* at 95–96, 112 S.Ct. at 1794 (Kennedy, J., dissenting). And finally, Justice Thomas stated that "there is a real and legitimate distinction between insanity acquittees and civil committees that justifies procedural disparities." *Id.* at 108, 112 S.Ct. at 1800 (Thomas, J., dissenting). Although Justice Thomas maintained that "freedom from bodily restraint" did not constitute a fundamental interest that merited strict scrutiny, he did

admit that under such a test "[c]ivil commitment as we know it would almost certainly be unconstitutional; only in the rarest of circumstances will a State be able to show a 'compelling interest,' and one that can be served in no other way, in involuntarily institutionalizing a person." *Id.* at 122, 112 S.Ct. at 1807–08 (Thomas, J., dissenting). In summary, the court concluded that civil commitment of a non-mentally ill but dangerous person would be:

> only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions and aside from permissible confinements for *mental illness,* incarcerates only those who are proved beyond reasonable doubt to have violated a criminal law.

*Id.* at 83, 112 S.Ct. at 1786 (emphasis added).

Likewise, this court relied upon a compelling interest in *Blodgett* that encompassed more than mere protection.

> Here the compelling government interest is the protection of members of the public from persons who *have an uncontrollable impulse* to sexually assault.

*Blodgett,* 510 N.W.2d at 914 (emphasis added). This court went on to say that "[s]o long as civil commitment is programmed to provide *treatment and periodic review,* due process is provided." *Id.* at 916 (emphasis added). The state in *Blodgett* asserted its compelling interest to be protection of society from those persons *unable to control their impulses* precisely because the Supreme Court in *Foucha* made clear that a civil commitment would *not* be narrowly tailored to the compelling government interest of protecting society alone.

> *Addington v. Texas,* 441 U.S. 418 [99 S.Ct. 1804, 60 L.Ed.2d 323] (1979), held that to commit an individual to a mental institution in a civil proceeding, the State is required by the Due Process Clause to prove by clear and convincing evidence the two statutory preconditions to commitment: that the person sought to be committed is mentally ill and that he requires hospitalization for *his own welfare* and protection of others.

*Foucha,* 504 U.S. at 75–76, 112 S.Ct. at 1783 (emphasis added).

The bottom line is that a state cannot incarcerate a person simply because it fears the person's future acts. It can, however, civilly commit a person whom it fears, so long as the commitment is narrowly tailored to the state's additional compelling interest in treating mentally ill people. *See Addington,* 441 U.S. at 429, 99 S.Ct. at 1811 (stating that the key question in civil commitment is "[w]hether the individual is mentally ill and dangerous to either himself or others *and is in need of confined therapy* " (emphasis added)). The difference, though subtle, is essential to the disposition of this case. *Foucha* allows a state to involuntarily deprive a dangerous person of his or her liberty only when it does so for the purpose of treating that person. And that is why the majority misses the mark in holding that the SDP Act is narrowly tailored to the only compelling government interest asserted by the state in this case—protecting the public from sexual assault. As the majority stated:

> [T]he SDP Act is an attempt *to protect the public* by treating sexual predators even more dangerous than those reached by the PP Act—the mentally disordered who retain enough control to 'plan, wait, and delay the indulgence of their maladies until presented with a higher probability of success.' And as the court of appeals recognized, the mental disorder requirement in the SDP Act serves the *state's interest in public safety* by aiding the prediction of dangerousness.

*Ante,* at 182. We concede that the majority's reliance on public safety alone would be sufficient to incarcerate Linehan for past criminal acts.[8] Because the state already has punished Linehan for his past criminal acts, however, *Foucha* will not allow it to rely upon public safety alone to incarcerate him for predicted future acts. Instead, the state must show that his civil commitment is necessary to the additional compelling government interest of providing care and treatment of the mentally ill.[9]

Before going any further, it is revealing to note that the state did not even bother to argue that its compelling government interest in passing the SDP Act was to provide treatment for Dennis Linehan or any other subsequent committee. And for that, the state deserves credit for its honesty. Although the statute provides a treatment mechanism, it is clear given the following circumstances regarding the bill's passage that the actual government interest was to lock up sexually dangerous persons in general and Dennis Linehan in particular.

Less than one week after this court ruled that Linehan could not be committed under the PP Act, the speaker of the house called for a meeting and was quoted as saying, "The prospect of these predators being released is frightening, especially for the women of Minnesota." Donna Halvorsen, *Sex Predators' Status Sparks Insecurity; Commitment Law Appears Frayed,* Star Trib., July 9, 1994, at 1B. Approximately five weeks later, the attorney general proposed legislation that he said would keep sexual predators "locked up." Robert Whereatt, *Laws Proposed to Keep Sex Predators off Streets,* Star Trib., Aug. 12, 1994, at 1A. The Governor, who at the same news conference announced he would call for a special legislative session, said, "By all accounts, these two men [10] remain a danger to the public." *Id.*

---

8. Such a compelling government interest can, depending on a state's definition of an insanity acquittee, reach a person found to be not guilty by reason of insanity. *See State v. Randall,* 192 Wis.2d 800, 532 N.W.2d 94, 106–07 (1995) (holding that because Wisconsin considers an insanity acquittee to be "guilty beyond a reasonable doubt," it can confine a presently sane insanity acquittee on dangerousness alone).

9. The majority correctly rejected Linehan's argument that criminal conviction and civil commitment are mutually exclusive. As this court stated in *Pearson,* "an uncontrollable and insane impulse to commit crime, in the mind of one who is conscious of the nature and quality of the act, is not allowed to relieve a person of criminal liability." *Pearson,* 205 Minn. at 556, 287 N.W. at 303. However, this does not mean that the tests for a commitment's validity under substantive due process are the same. In fact, they are very different.

10. In addition to Linehan, we concluded that the state could not commit Peter Rickmyer under the PP Act.

After this court denied the state's petition for rehearing in *Linehan I*, the governor announced that the state would move Linehan to an old staff residence just outside the prison and keep him under constant surveillance. Paul Gustafson & Robert Whereatt, *Rapist/Murderer Wins Release—and Tight Surveillance*, Star Trib., Aug. 16, 1994, at 1A. When Linehan's attorney said the treatment was "appalling," the governor responded by saying, "I'd much rather make a mistake on the side of public safety than be overwhelmingly concerned with some attorney's perception of the civil rights of Mr. Linehan." *Id.* The Ramsey County prosecutor, meanwhile, was quoted by USA Today as saying, "These are dangerous people and we've got to protect the women and children in our communities." Mimi Hall, *A Furor Brews over Release of Sex Offenders*, USA Today, Aug. 17, 1994, at 3A.

Just eight days before statewide primary elections, the governor officially called for a one-day, one-bill special legislative session. Robert Whereatt, *Legislators, Carlson Agree to Session; Ground Rules Set With Goal of Avoiding Partisanship*, Star Trib., Aug. 24, 1994, at 1B. The legislature convened one week later and in just 1 hour, 37 minutes passed the SDP Act by a 65–0 margin in the senate and a 133–0 margin in the house. Donna Halvorsen & Robert Whereatt, *Sexual Predator Bill OK'd, Signed*, Star Trib., Sept. 1, 1994, at 1A. Immediately prior to the session, the bill's drafters had told their colleagues to avoid speaking about Linehan specifically because, "Whatever we say on the floor will be used against us. * * * It's going to be used to challenge the bill." *Id.*

By themselves, these circumstances are enough to render this rather transparent effort at preventive detention unconstitutional.[11] But we assert in the alternative that

the SDP Act is not sufficiently narrow to serve even the government's additional compelling interest in providing care and treatment of the mentally ill. Once again, the foundation for this conclusion is *Foucha.*

> [T]he State asserts that because Foucha once committed a criminal act and now has an *antisocial personality* that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely. This rationale would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a *personality disorder* that may lead to criminal conduct. The same would be true of any convicted criminal, even though he has completed his prison term.

*Foucha*, 504 U.S. at 82–83, 112 S.Ct. at 1787 (emphasis added). Although Justice O'Connor's concurrence intimates that something less than a bona fide mental illness would suffice, the plurality in *Foucha* could not be more clear: A state cannot civilly commit a person who is dangerous and has a "personality disorder." *Foucha*, 504 U.S. at 82–83, 112 S.Ct. at 1787 (explaining that a state cannot civilly commit a person who is dangerous and has either an "antisocial personality" or "a personality disorder"). The person must be both dangerous *and* mentally ill. It is debatable whether *Blodgett*'s holding that a person who has a psychopathic personality fits within the definition of mental illness as asserted in *Foucha*,[12] but it could not be more clear that a person who has *only* an antisocial "personality disorder" does not fit within the definition of mental illness as asserted in *Foucha.*

This limitation is essential. Not because persons with "personality disorders" are any less dangerous than those who have recognized mental illnesses,[13] but because the very

---

11. The Kansas Supreme Court in holding a similar statute unconstitutional noted that:

 It is clear that the overriding concern of the legislature is to continue the segregation of sexually violent offenders from the public. Treatment with the goal of reintegrating them into society is incidental, at best.

 *Matter of Care and Treatment of Hendricks*, 259 Kan. 246, 912 P.2d 129, 136 (1996), *cert. granted*, —— U.S. ——, 116 S.Ct. 2522, 135 L.Ed.2d 1047 (1996).

12. The Supreme Court did not grant certiorari. *In re Blodgett*, 510 N.W.2d 910 (Minn.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994).

13. In fact, the court of appeals noted that "[p]ersons whose mental afflictions leave them with a measure of self-control present an especially insidious risk, for they retain the ability to plan, wait, and delay the indulgence of their maladies until presented with a higher probability of suc-

essence of the state's constitutionally required compelling interest in civilly committing a person is treatment of the mentally ill. When, in fact, the state's only articulated interest in passing a law is protection of society, it becomes apparent that the real purpose of the law, despite its platitudes to treatment, is preventive detention. We do not maintain that the SDP Act violates substantive due process only because those with APD currently cannot be treated. We maintain only that the legislature's reason for passing the SDP Act, once properly exposed under the spotlight of strict scrutiny, was not for the *stated* purpose of treatment, but for the *actual* purpose of detaining a person who frightens us. *Cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (holding that facially neutral statute violated free exercise clause in part because of city council's discriminatory motivation); *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266–68, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977) (concluding that the circumstances surrounding the passage or enactment of legislation can be used to determine if the statute is a purposeful device for discriminatory treatment). Yet the majority, after noting that *Foucha* presents "constitutional limits to state-created definitions of mental illness in the civil commitment context," somehow manages to dim the spotlight and instead "give[s] the legislature due regard in identifying medically recognized mental disorders, such as APD, that explain a person's dangerousness and that are appropriate for civil commitment and treatment." *Ante*, at 187. Never before has strict scrutiny been so lenient.

As the Kansas Supreme Court recently demonstrated, actual strict scrutiny necessarily leads to the opposite result. *Matter of Care and Treatment of Hendricks*, 259 Kan. 246, 912 P.2d 129 (1996) (striking down a civil commitment statute nearly identical to the SDP Act), *cert. granted*, —— U.S. ——, 116 S.Ct. 2522, 135 L.Ed.2d 1047 (1996). The majority in the case at bar distinguishes *Hendricks* by stating it was based upon Kansas' own statutory definition of mental illness. *Ante*, at 185 n. 11. Although the Kansas Supreme Court did look at its mental illness statutes during its substantive due process analysis, it actually based its holding on a strict reading of *Foucha*'s mental-illness requirement:

> Therefore, as applied to Hendricks, the constitutionality of the Act depends upon a showing of dangerousness without a finding of mental illness. Clearly, the due process standard of *Addington* and *Foucha* is not met by the Act as applied to Hendricks.

*Hendricks*, 912 P.2d at 138.

Likewise, a federal district court in a habeas corpus proceeding found that Washington's Sexually Violent Predator Statute, which had been upheld by the Washington Supreme Court,[14] also failed strict scrutiny. "Like the scheme rejected in *Foucha*, the Statute here permits indefinite incarceration based on little more than a showing of potential future dangerousness. * * * Predictions of dangerousness alone are an insufficient basis to continue indefinitely the incarceration of offenders who have completed their prison terms." *Young v. Weston*, 898 F.Supp. 744, 749, 751 (W.D.Wash.1995). Unlike the majority in this case, these courts fulfilled their constitutional duties, made difficult decisions, and followed *Foucha*'s mandate—namely that involuntary civil commitment is narrowly tailored to the government's compelling interest in treatment *only* when the legislature's actual reason for passing the statute is to give a mentally ill person the help he or she needs.[15]

---

cess." *Matter of Linehan*, 544 N.W.2d 308, 318 (Minn.App.1996) (*Linehan II* ).

14. *In re Young*, 122 Wash.2d 1, 857 P.2d 989 (1993).

15. While it is true that the Wisconsin Supreme Court recently upheld a civil commitment statute similar to our SDP Act, it did so by relying entirely upon Justice O'Connor's concurrence in

*Foucha. State v. Post*, 197 Wis.2d 279, 541 N.W.2d 115, 127 (1995). Unlike the *Foucha* plurality, which required a state to find a committee both mentally ill and dangerous, Justice O'Connor required only that there be some medical justification for commitment. *Foucha*, 504 U.S. at 88, 112 S.Ct. at 1789–90 (O'Connor, J., concurring). Consequently, the Wisconsin Supreme Court, much like majority in the case at bar, found that APD is a sufficient medical basis

## III. Equal protection, ex post facto and double jeopardy

Technically speaking, we do not disagree with the majority's equal protection analysis. Unlike substantive due process, which necessarily examines the *statute's* effect on a person's fundamental right of liberty, equal protection focuses on the *distinction* between those who fit within the statute's reach and those who do not. Unless such a distinction involves a suspect classification, this court will ask only if there is any rational basis for such a selection. *Pearson,* 309 U.S. at 274, 60 S.Ct. at 525–26. When such a statute threatens a liberty interest, however, this court will apply heightened scrutiny and ask whether the statute delineates genuine and substantial distinctions. *Blodgett,* 510 N.W.2d at 917. The SDP Act distinguishes between those sexually dangerous persons who have a mental disorder and those who do not. Minn.Stat. § 253B.02, subd. 18b(a) (1994). The majority holds that the legislature's decision to civilly commit the first group but not the second is valid because mental disorders help to "isolate sexually dangerous persons most likely to harm others in the future," and because "the state's interest in treating sexual predators is served by confining the scope of the SDP Act to those with mental disorders." *Ante,* at 187. In short, this court is upholding the legislature's determination that sexually dangerous persons with a mental disorder are both more dangerous and more amenable to treatment than are those without a mental disorder.

Although we do not disagree with this conclusion, we point out that the first justification for the distinction (dangerousness), while sufficient to uphold the act under the equal protection clause, is not sufficient to uphold the act under due process analysis. Likewise, the second justification for the distinction (treatment), while mere surplusage under equal protection requirements, is a necessity for this court's conclusion that the SDP Act does not violate ex post facto or double jeopardy. Unlike substantive due process, which focuses on the government's interests, ex post facto and double jeopardy focus on the statute's purpose and whether it is "for treatment *purposes* and * * * not for *purposes* of preventive detention." *Call v. Gomez,* 535 N.W.2d 312, 320 (Minn.1995) (emphasis added). Although it is apparent that the legislature's motivation in passing the SDP Act was to lock up dangerous persons such as Linehan, the majority noted that "[t]he *purpose and effect* of the SDP Act is * * * predominantly remedial, not punitive." *Ante,* at 188 (emphasis added).

As stated earlier, we elect not to quibble with this holding at this time. *But see Young v. Weston,* 898 F.Supp. 744, 751–54 (W.D.Wash.1995) (holding that Washington's sexually violent predator statute violates ex post facto and double jeopardy). Despite the legislature's motivation, the statute does include enough treatment provisions to conclude that its stated purpose is remedial. But we note that the Supreme Court has upheld as remedial only those civil commitment statutes that provide for both mandatory treatment at a psychiatric care facility and full discharge once the patient demonstrates that he or she no longer is in need of treatment. *See Allen v. Illinois,* 478 U.S. 364, 369–75, 106 S.Ct. 2988, 2992–95, 92 L.Ed.2d 296 (1986). The majority correctly states that "Linehan has not offered evidence that the treatment regime at MSH or MPPTC is a sham, or even that such treatment is inef-

---

for commitment. *Post,* 541 N.W.2d at 127–28. Such a conclusion is not valid under federal constitutional jurisprudence however. Not only does Justice O'Connor's concurrence lack the weight of law, it lacks any real guidance given the facts in both *Post* and *Linehan II.* The committee in *Foucha* had been found not guilty by reason of insanity. As Justice O'Connor put it, Foucha had "escape[d] punishment" by pleading insanity. *Id.* at 87, 112 S.Ct. at 1789 (O'Connor, J., concurring). Consequently, Justice O'Connor noted that "[a]lthough insanity acquittees may not be incarcerated as criminals or penalized for

asserting the insanity defense, this finding of criminal conduct sets them apart from ordinary citizens." *Id.* (O'Connor, J., concurring). Linehan, like the committee in *Post,* did not escape criminal punishment for his prior bad acts. He was convicted and served his sentence. Accordingly, he is now outside the realm of the criminal justice system. To use Justice O'Connor's words, Dennis Linehan is now an "ordinary citizen," one whom the state can civilly commit only upon a finding of both dangerousness and mental illness.

fective." *Ante,* at 189. But given the legislature's real motivation behind the SDP Act, we are concerned that such evidence will become readily available in the near future. When that occurs, we will not hesitate to find that the SDP Act, in addition to violating substantive due process, also violates ex post facto and double jeopardy.

PAGE, Justice (dissenting).

I join the dissent of Justice Tomljanovich. I write separately to note that there is no question that Dennis Linehan is an extremely dangerous person. There is also no question that he has been tried, convicted, and punished under our criminal law. Some might argue, myself included, that the sentence[1] he received was not severe enough and that it should have been longer. Certainly if constitutional limitations did not exist, I would have no qualms about Linehan remaining in preventive detention for the rest of his life. However, constitutional limitations do exist, and we must respect those limitations even if it means that the Dennis Linehans of the world must be set free after completing their criminal sentence. Thus, I respectfully dissent because I believe that the Sexually Dangerous Persons Act goes well beyond the limits imposed by our constitution and permits unrestrained preventive detention based solely on an individual's dangerousness.

I also write separately to comment on the court's treatment of *Blodgett. Blodgett* was a 4–3 decision of this court which I joined. *In re Blodgett,* 510 N.W.2d 910 (Minn.1994). I joined that decision because I believed the court's holding fit within constitutional limitations. While I did believe then, and still believe now, that our decision in *Blodgett* fit within constitutional limits, I also believe that with that decision we reached the extreme outer limits of constitutionally permitted preventive detention. The court now holds that *Blodgett* would have to be overturned if we were to find the Sexually Dangerous Persons Act unconstitutional. I disagree. My read-

ing of *Blodgett* is that the "inability to control" sexual impulses has constitutional significance and represents a substantive due process threshold for preventive detention. That is the basis on which I joined the court's opinion. Indeed, this requirement previously saved the Psychopathic Personality Commitment Act from a vagueness challenge in *Pearson v. Probate Court of Ramsey County,* 205 Minn. 545, 287 N.W. 297 (1939), *aff'd,* 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). In *Pearson,* this court stated:

> Applying these principles to the case before us, it can reasonably be said that the language of Section 1 of the [Psychopathic Personality Commitment Act] is intended to include those persons who, by a habitual course of misconduct in sexual matters, have evidenced an utter lack of power to control their sexual impulses and who, as a result, are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire. *It would not be reasonable to apply the provisions of the statute to every person guilty of sexual misconduct nor even to persons having strong sexual propensities.* Such a definition would not only make the act impracticable of enforcement and, perhaps, unconstitutional in its application, but would also be an unwarranted departure from the accepted meaning of the words defined.

*Id.* at 555, 287 N.W. at 302–03 (emphasis added).

The court now holds that the instant case is indistinguishable from *Blodgett* despite the fact that the "inability to control" requirement articulated in *Blodgett* is not contained in the Sexually Dangerous Persons Act. In upholding the psychopathic personality statute, the *Blodgett* court made clear that there are constitutional limitations to the state's use of preventive detention. However, no such limitations are found in the Sexually Dangerous Persons Act. The only real criteria for commitment under the Sexually Dan-

---

1. A sentence of life in prison without the possibility of release may well have been appropriate based on the criminal conduct for which Linehan was convicted. Indeed, it may have been better than he deserved. In any event, such a sentence would have certainly met constitutional muster. Unfortunately, for whatever reason, at the time Linehan's crime was committed, the legislature did not see fit to provide for such a sentence.

gerous Persons Act is dangerousness. Thus, the court's decision today goes well beyond *Blodgett*. The court has, in essence, concluded that there are no constitutional limitations on the state's use of preventive detention.

Today the target is people who are sexually dangerous. Which class of people, who are different from us and who we do not like, will it be tomorrow?

As Justice Simonett wrote in *Blodgett*, at issue is not only "the safety of the public on the one hand and, on the other, the liberty interests of the individual * * *. In the final analysis, it is the moral credibility of the criminal justice system that is at stake." 510 N.W.2d at 918. By the court's decision today, that credibility is placed in jeopardy.